UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
CCC INSURANCE CORPORATION,

                Plaintiff,

          - against -

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

                Defendant.

-----------------------------------------------------------------------------x

Civil Action No.
07 Civ. 11393 (PKC)

**INITIAL DISCLOSURES
PURSUANT TO FED. R.
CIV. P.26(a)(1)**

Plaintiff, CCC Insurance Corporation ("CCCIC"), by its attorneys, Saretsky Katz Dranoff & Glass, L.L.P., makes the following initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) based upon the information presently available to it, and reserving the right to amend or supplement such disclosures if, and when, different or additional information becomes available:

    1.    Currently available information in the possession of CCCIC concerning the name, addresses and telephone numbers of individuals likely to have discoverable information that CCC may use to support its claims as well as the subjects of the information is as follows:

    a.    A witness under the control of National Union Fire Insurance Company of Pittsburgh, PA. ("NUFIC") who has knowledge regarding the negotiation and procurement of Certificate of Casualty Reinsurance No. 3649635, effective on January 20, 1993 (the "NUFIC Contract");

    b.    A witness under the control of NUFIC who has knowledge of the underwriting of the NUFIC Contract;

    c.    Jeffrey A. Gordon, Esq., Director, Complex Healthcare Malpractice Claims A.I. Healthcare 101 Hudson Street, 28th Floor Jersey City, New Jersey 07302A and/or another witness under the control of NUFIC who has knowledge regarding the bases for NUFIC's failure and refusal to pay CCCIC $5,000,000 pursuant to the NUFIC Contract

all of which sum is attributable to excess medical malpractice insurance that CCCIC provided as respects a claim known as the Muniz claim.

CCCIC reserves the right to supplement its response pending further and continuing investigation and/or as may be identified in the course of discovery.

2.    Copies of the documents, data compilations or tangible things (collectively, "Documents") in the possession, custody, or control of CCCIC that may be used to support its claims and/or defenses are annexed hereto as Exhibit "A." . CCCIC may also use additional documents from pending further and continuing investigation and/or as may be identified in the course of discovery.

3.    CCCIC is claiming damages against the defendant in the amount of not less than $5,000,000.00, plus statutory interest  that was computed based upon NUFIC's failure and refusal to pay CCIC $5,000,000 pursuant to the NUFIC Contract, attributable to the Muniz claim.

4.    Not applicable in this case.

Dated:        New York, New York
              March 14, 2008

Yours, etc.,

Saretsky Katz Dranoff & Glass, L.L.P.
Attorneys for Plaintiff

By: _____
      Allen L. Sheridan (ALS-0960)

475 Park Avenue South
New York, New York 10016
(212) 973-9797

To:

D'Amato & Lynch
Attorneys for Defendant
70 Pine Street
New York, New York 10270
(212) 269-0927

<u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK     } SS.:
COUNTY OF NEW YORK }

Ellie Brinson being duly sworn deposes and says that deponent is not a party to the

action, is over 18 years of age and resides in Hudson County, New Jersey; that on

March 14, 2008 deponent, on behalf of plaintiff CCC INSURANCE CORPORATION,

served one copy of the within: **INITIAL DISCLOSURES PURSUANT TO FED. R. CIV.**

**P.26(a)(1)**, upon:

D'Amato & Lynch, Esqs.
Attorneys for Defendant
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
70 Pine Street
New York, NY  10270

at the address designated for that purpose depositing same enclosed in postpaid

properly addressed wrappers in an official depository under the exclusive care of the

United States Post Office in the State of New York.

_____
Ellie Brinson

Sworn to before me March 14, 2008

_____
Notary Public

**JACK RAMOS**
**Notary Public, State of New York**
**No. 01RA6046532**
**Qualified in Nassau County**
**Commission Expires August 14, 20___**

# EXHIBIT "A"

# REINSURANCE
## CERTIFICATE OF CASUALTY REINSURANCE
### NATIONAL UNION FIRE INSURANCE COMPANY
### OF PITTSBURGH, PA.

### CERTIFICATE NO. 3649635

In consideration of the stipulation set forth (including the general conditions appearing on endorsement number one (1) and payment of the premium named below, reinsurance is hereby provided for the ceding company CCC Insurance Corporation on its interest as an insurer under its policy numbers TBA to be issued as follows per items 1,2,3 and 4.

Item 1 –  Assured:  Combined Coordinating Council, Inc. etal as more fully defined in primary policy.

Item 2 –  Location:, 240 West 35th Street New York N.Y. 10001

Item 3 –  Type of Insurance:  Excess Medical Malpractice following form of Original Assured's Primary Policies and/or Policies issued to Original Assured by CCC Insurance Corp.

Item 4 –  Policy Limits:  $5,000,000 aggregate sub-limit for each of 7 hospitals and $15,000,000 aggregate limit all hospitals; limits apply separately for each period (outlined in Item 9) excess of Item 7.

Item 5 –  Company Retention:  $20,000,000 aggregate incurred losses for the four year policy period 7/1/89 – 7/1/93 plus $100,000 SIR each claim thereafter.

Item 6 –  Reinsurance Accepted:  100% of Item 4

Item 7 –  Underlying Amounts:  Original Insured's Medical Malpractice Program – aggregate incurred losses as follows:  Period A – $76,000,000; Period B – $76,000,000; Period C – $76,000,000; Period D – $76,000,000.

Item 8 –  Retro Dates:
Period A. 7/1/89
Period B. 7/1/90
Period C. 7/1/91
Period D. 7/1/92

Item 9 – Coverage Period:
Period A. Claims occurring during the period
7/1/89 – 7/1/90 and discovered during the period
7/1/1997 – 7/1/2000.

Period B. Claims occurring during the period
7/1/90 – 7/1/91 and discovered during the period
7/1/1998 – 7/1/2001.

Period C. Claims occurring during the period
7/1/91 – 7/1/92 and discovered during the period
7/1/1999 – 7/1/2002.

Period D. Claims occurring during the period
7/1/92 – 7/1/93 and discovered during the period
7/1/2000 – 7/1/2003.

Item 10 – Company Policy Periods:    January 20, 1993 to
January 20, 1994 (see Item 9)

Item 11 – Reinsurance Inception Date: January 20, 1993

Item 12 – Premium Due at Inception: $4,500,000 Gross M&D

_K. Gregorio_

**Authorized Representative**

ENDORSEMENT NO. 1

## GENERAL CONDITIONS FOR NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

### CASUALTY FACULTATIVE REINSURANCE CERTIFICATE

This Certificate is an Agreement of Reinsurance under which the Reinsurer indemnifies the Company with respect to its insurance liability assumed under the policy set forth on the front of this Certificate subject to the following terms and conditions:

**1. LIABILITY OF REINSURANCE AND RETENTION:**

The liability of the Reinsurer shall follow the terms and conditions of the Company's policy furnished to the Reinsurer at the effective date of this Reinsurance Certificate unless otherwise specifically provided herein by endorsement and made a part of this Certificate. Any change in the terms and conditions of the Company's policy subsequent to the effective date of this Reinsurance Certificate shall not increase or extend the Reinsurer's liability hereunder unless such change is made a part of this Certificate by endorsement issued by the Reinsurer. This reinsurance is accepted in reliance upon the Company not reducing its net Retention.

For the purpose of this Certificate, "Company Retention" shall mean the amount specified in item 5. of the Declarations except when such amounts may be covered by Treaty Reinsurance and/or Non-specific Excess of Loss Catastrophe Reinsurance applying to more than one of the Company's policies in a single event.

Should the actual amount of liability retained by the Company be reduced by reinsurance or otherwise, without notice to the Reinsurer, the Reinsurer's liability for loss which otherwise would be fully collected hereunder shall be determined in accordance with the following:

(a)  If this reinsurance is on an excess-of-loss basis, then the Reinsurer shall:

    1.  not be liable for a larger proportion of any loss than the percentage which the actual amount of liability retained by the Company at the time of loss bears to the Company Retention; and

    2.  there shall be no return premium to the Company on account of any such reduction in the Reinsurer's liability for loss.

(b)  If this reinsurance is on a pro-rata (or quota-share) basis, the Company warrants that the Company Retention will be the Company's retained liability under the policy reinsured by this certificate.

(c)  If at the time of any loss, the actual amount of liability retained by the Company shall be less than the Company Retention, reinsurance hereunder shall be void either from inception or on the date which the reduction took place, and the Company and the Reinsurer shall each return to the other any remittances for loss or premium made following such date.

2.  **CLAIMS:**

(a)  The Company agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify the Reinsurer promptly of any event or development which the Company reasonably believes might result in a claim against the Reinsurer.  The Company further agrees to forward to the Reinsurer copies of such pleadings and reports of investigations as are pertinent to the claim and/or as may be requested by the Reinsurer.

(b)  The Reinsurer shall have the right at its own expense to be associated with the Company in the defense or control of any claim, suit, or proceeding involving or which may involve the reinsurance provided under this Certificate and the Company and Reinsurer agree to cooperate in every respect in the defense and control of each such claim, suit or proceeding.

(c)  Upon receipt by the Reinsurer of satisfactory evidence of payment of loss for which reinsurance is provided hereunder, the Reinsurer shall promptly reimburse the Company for its share of the loss and loss expense, subject to Paragraph 4. of these General Conditions.

(d)  The term "loss" shall mean only such amounts as are actually paid by the Company in settlement of claims or in satisfaction of awards or judgements.  The term "loss" shall not include expense.

(e) The Reinsurer's liability for its proportion of a "loss" incurred by the Company shall be determined as follows:

   (i) If the reinsurance provided hereunder is on an excess-of-loss basis, the Reinsurer shall be liable for its excess proportion of a "loss" after application of the Company's retention;

   (ii) If the reinsurance provided hereunder is on a pro-rata or quota-share basis, the Reinsurer shall be liable for its proportion of a "loss" after application of any other reinsurance excess of pro-rata insuring to the benefit of the Reinsurer.

(f) The term "loss expense" shall mean all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgements, including the office expenses of the Company and the salaries and expenses of all other employees of the Company.

(g) The Reinsurer's liability for its proportion of "loss expense" incurred by the Company shall be determined as follows:

   (i) If the reinsurance provided hereunder is on an excess-of-loss basis, the Reinsurer's proportion of the "loss expense" shall be in the same ratio as its share of "loss" bears to the total amount of such "loss";

   (ii) If the reinsurance provided hereunder is on a pro-rata or quota-share basis, the Reinsurer's proportion of the "loss expense" shall be in the same ratio as the Reinsurer's limit of liability bears to the Company's gross limit of liability under the policy reinsured.

(h) The Company shall pay or credit the Reinsurer with its proportions of salvages (i.e., recoveries or reimbursements made or obtained by the Company), after deducting the cost of obtaining such salvage. The cost of obtaining salvage shall include salaries and expenses of the Company's staff adjusters but shall exclude the office expenses or salaries and expenses of all other employees of the Company.

If the insurance provided hereunder is on an excess-of-loss basis, salvage shall be applied in the inverse order in which liability attached, otherwise salvage shall be applied proportionately.

3.    **INSPECTION:**

At the request of the Reinsurer, the Company shall place at its disposal, and the Reinsurer shall have the right at all reasonable times in the office of the Company, or elsewhere, if mutually agreed, to inspect all books, records and papers of the Company in any way pertaining to the reinsurance provided hereunder, including but not limited to claims in connection therewith.

4.    **INSOLVENCY:**

In the event of the insolvency of the Company, the reinsurance liability provided by this Certificate shall be payable by the Reinsurer directly to the Company, or to its liquidator, receiver or statutory successor on the basis of the liability of the Company under the policy reinsured without diminution because of such insolvency.

It is understood, however, that the Reinsurer shall be given written notice of the pendency of each loss or claim against the Company, indicating the policy reinsured, which may involve the reinsurance liability provided by this Certificate within a reasonable time after such loss or claim is filed in the insolvency proceeding.

During the pendency of such loss or claim, the Reinsurer shall have the right to investigate each such loss or claim and interpose, at its own expense, in the proceeding where the loss or claim is to be adjudicated, any defense which it may deem available to the Company or its liquidator, receiver or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent company as part of the expense of liquidation to the extent of a proportionate share of the benefits which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

5.    **TAXES:**

The Company shall be liable for taxes on premiums ceded to the Reinsurer under this Certificate.

**6.    OFFSET:**

The Reinsurer and the Company shall have the right to offset any balance or balances, whether on account of premiums or losses, otherwise due from either party to the other party under this Certificate or under any other Reinsurance Certificate or Agreement heretofore or hereafter entered into by and between them, and may offset the same against any balance or balances due or to become due to the former from the latter under the same or any other Reinsurance Certificate or Agreement between them.    The party asserting the right of offset shall have and may exercise such right (whether the balance or balances due to become due to such party from the other or on account of premiums or on account of losses or otherwise and regardless of the capacity, whether as assuming reinsurer or as ceding insurer, in which each party acted under the Certificate or Agreement involved, provided, however, that in the event of insolvency of either party hereto, offsets shall only be allowed) in accordance with the provision of the New York State Insurance Law, Section 538.

**7.    PRIOR ACCEPTANCE:**

If the reinsurance provided hereunder attaches prior to the date of acceptance of the Reinsurer, the Company warrants that there are no known or reported claims or losses which might be recoverable under the Certificate as of the date this reinsurance is accepted.

**8.    CANCELLATION:**

(a)    Should the Company's policy be cancelled, this Certificate shall terminate simultaneously.    This Certificate may also be cancelled by the Company or by the Reinsurer upon not less than thirty (30) days prior written notice, one to the other, stating when thereafter the reinsurance afforded hereby shall terminate.

Proof of mailing shall be deemed notice, and calculation of the earned premium shall follow the Company's calculation in the use of short-rate or pro-rata tables.

(b)    In the event of non-payment of premium, this Certificate may be cancelled by the Reinsurer by giving not less than ten (10) days prior written notice stating when thereafter the reinsurance afforded hereby shall terminate.    Proof of mailing shall be deemed proof of notice.

**9.    DEFINITIONS:**

As used in this Certificate, the terms listed below are defined as follows:

EXCESS OF LOSS:  The limit(s) of liability of the Reinsurer, as stated in Item 4. of the Declarations, applies(y) only to that portion of loss settlement(s) in excess of the applicable retention of the Company as stated in Item 5. of the Declarations.

CONTRIBUTING EXCESS:  The Company's policy applies in excess of other valid insurance, reinsurance or self-insured retention and the limit of liability of the Reinsurer applies proportionately to all loss settlements in the percentage(s) set forth in Item 4. of the Declarations.

NON-CURRENT:  The  reinsurance provided does not apply to any risks of loss or damage covered under the Company's policy other than those specifically set forth in the Declarations.  The retention of the Company and the liability of the Reinsurer shall be determined as though the Company's policy applied only to the hazards or risks of loss or damage specifically described in the Declarations.

**10.    MISCELLANEOUS:**

The terms of this Certificate shall not be waived, amended or in any way modified unless such waiver, amendment or notification is contained in an endorsement to this Certificate, executed by a duly authorized representative of the Reinsurer.  Assignment of this Certificate shall not be valid except with the written consent of the Reinsurer.

IN WITNESS WHEREOF, the Reinsurer has caused this Certificate to be executed and attested, and it shall become valid and binding when signed by a duly authorized representative.

_____
Authorized Representative

Page 6 of 6

**ENDORSEMENT NO. 2**

**CERTIFICATE NO.: 3649635**

**EFFECTIVE ON: JANUARY 20, 1993**

It is agreed that the following paragraph is added to Endorsement No. 1.

II. FOLLOW THE FORTUNES CLAUSE

The true intent of this Agreement of Reinsurance being that the Reinsurer shall, in every case to which this agreement applies and in the amounts specified, follow the fortunes of the Company.

Authorized Representative

ENDORSEMENT NO. 3

CERTIFICATE NO.: 3649635

EFFECTIVE ON: JANUARY 20, 1993

It is agreed that the following paragraphs are added to Endorsement 1 under section 10 Miscellaneous:

Claims made in conformity with New York State Civil Practice Law & Rules (CPLR) Sections 203 (c), 304 and 306 (b) shall be considered as claims made within the extended discovery period covered hereunder.

Underlying amounts, for each policy period, are to be considered as exhausted by incurred losses (paid losses and expenses plus case reserves on open losses). Coverage hereunder attaches if incurred losses exceed underlying amounts. Aggregate status reports and/or bordereau to be submitted periodically as mutually agreed.

# SARETSKY KATZ DRANOFF & GLASS, L.L.P.

475 PARK AVENUE SOUTH
NEW YORK, NEW YORK 10016

TELEPHONE (212) 973-9797
FACSIMILE (212) 973-0939

ROCKLAND COUNTY OFFICE

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

BARRY G. SARETSKY
bsaretsky@skdglaw.com

**VIA FEDERAL EXPRESS**

November 14, 2006

Jeffrey A. Gordon, Esq.
Director, Complex Healthcare Malpractice Claims
A.I. Healthcare
101 Hudson Street, 28th Floor
Jersey City, New Jersey 07302

      Re:    National Union Fire Insurance Company of Pittsburgh, PA
              Reinsurance of CCC Insurance Corp. pursuant to
              Certificate of Casualty Reinsurance No. 3649635

Dear Jeff:

      We appreciated hearing from you last month concerning the reinsurance recoverables due to our client, CCC Insurance Corp. (CCCIC), and were especially grateful to hear that this matter has "found a home" with you and your team.  We write in furtherance of our telephone discussion, and to enclose with this letter the following data and additional documentation that you requested in order to complete your review:

        • hard copies of the reinsured CCCIC policies [attached to this letter];

        • hard copies of the "tree" for each of the four implicated years (1989 through 1992), showing the insurers in each of the coverage layers (and, where applicable, the reinsurers) [in the front pocket of each of the accompanying blue looseleaf binders],

        • hard copies of the underlying policies in each of the implicated years [in the accompanying blue looseleaf binders],[1]

---

[1]    With respect to the primary layer in each year, NUFIC issued separate policies to each of the CCC hospitals.  We have provided Brookdale's policy; the terms and conditions of the other hospitals' primary policies are identical.

Saretsky Katz Dranoff & Glass, L.L.P.

Jeffrey A. Gordon, Esq.
A.I. Healthcare
November 14, 2006
Page 2

* a computer disk containing the following spreadsheets, with data
  as at September 30, 2006 [attached to this letter]:

    * loss runs for each of the years implicated by NUFIC's
      occurrence wrap reinsurance, listing, by name, all claims in
      that year and, among other things, the total paid indemnity,
      total paid expenses, and total incurred (demonstrating
      exhaustion of the $76MM underlier),

    * Schedule A - for each of the years implicated by NUFIC's
      occurrence wrap reinsurance, a list of all transactions by
      disbursement date, showing the cumulative sum paid,

    * Schedule B - a loss run of claims falling in the occurrence
      wrap, by year and by CCC institution, showing current
      incurred,

    * Schedule C – a listing showing the 6 claims as to which
      the NUFIC recoverables relate, 5 of which are now closed;
      the 3 claims remaining open that fall within the occurrence
      wrap and that are currently reserved for more than CCCIC's
      $100,000 per-claim self-insured retention; and the
      recoveries submitted to NUFIC for payment ($9,997,367),[2]
      and

    * Schedule D – a recap, on a claim-by-claim basis.

We trust that this information and documentation will permit you to
complete your review.

As you know, as respects approximately one-half of the sum now due, it
has been nearly a year since we first notified NUFIC of its payment obligation.
We are anxious to do whatever we can to expedite the review process so that
payment to CCCIC of the entire sum now due can be authorized and paid as
soon as possible.

---

[2]      Please note that, as respects the Muniz claim, the sum paid by CCCIC exceeds the
$5MM per claim cap on NUFIC's reinsurance by $51,911. Accordingly, Schedule C shows an
appropriate adjustment in that sum.

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Jeffrey A. Gordon, Esq.
A.I. Healthcare
November 14, 2006
Page 3


        If you have questions, we would be happy to discuss these matters with
you.


                                                        Kind regards,

                                                        Barry G. Saretsky


cc (w/o enc):  Terence L. Kelleher, Esq.
               John Tetro
               John Elias
               Combined Coordinating Council, Inc.

               Anthony Mercurio
               Marsh USA

# SARETSKY KATZ DRANOFF & GLASS, L.L.P.

### 475 PARK AVENUE SOUTH
### NEW YORK, NEW YORK 10016

TELEPHONE (212) 973-9797
FACSIMILE (212) 973-0939

ROCKLAND COUNTY OFFICE

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

BARRY G. SARETSKY
bsaretsky@skdglaw.com

February 28, 2007

Jeffrey A. Gordon, Esq.
Director, Complex Healthcare Malpractice Claims
A.I. Healthcare
101 Hudson Street, 28th Floor
Jersey City, New Jersey 07302

> Re:   National Union Fire Insurance Company of Pittsburgh, PA
>        Reinsurance of CCC Insurance Corp. pursuant to
>        Certificate of Casualty Reinsurance No. 3649635

Dear Jeff:

I write to follow up concerning the long-outstanding reinsurance recoverables due to our client, CCC Insurance Corp. (CCCIC).

The history, as you know, begins with our initial request for payment, which was made in December 2005.

We understand that that request was sent to David Branca's attention, but that it was forwarded on first to Richard LaGuarina, and then to Lance Williams in Berkley Heights, New Jersey. On April 20, 2006, Lance sent an e-mail to CCC and me asking if there were updated invoices with respect to the occurrence wrap account and if the sum then due (approximately $4.8 million) was still outstanding. We advised him that there were no updates and that the invoice remained unpaid. About three weeks later, on May 9, 2006, when Lance and I spoke by telephone, he advised me that he was awaiting final approval from his manager and that May 15, 2006 was the expected payment date.

When, by June 1, 2006, CCCIC's manager had not received payment, we again spoke with Lance, who advised there was a new manager on the account who wished to review NUFIC's policy documentation before approving payment, but that NUFIC was unable to locate that policy documentation in its files. We provided it to Lance the following day. Later in June, before the annual meeting

Jeffrey A. Gordon, Esq.
A.I. Healthcare
February 28, 2007
Page 2

of CCCIC's Board, we asked Lance for an updated estimated payment date, but he was unable to provide us with any information.

Later that month, at a meeting with NUFIC's David Fields and David Branca concerning another insurance matter we raised this matter with them. In response to their offer to assist us, we provided them with the above chronology. I am sure you can understand how frustrated we became in July when we learned from CCC's broker at Marsh that the matter seemed to be going in circles, because it had once again been forwarded to Richard LaGuarina.

Richard's July e-mail to the broker only served to heighten our frustration, because not only did it state that the invoice was "recently sent," but it illustrated a misunderstanding of the nature of the matter, referring to "previous payments against this reinsurance" that "may have been inadvertently applied internally against the primary malpractice policy we also wrote with CCC" and a need "to verify the proper cumulative payments against this primary policy, against what has been historically paid against the reinsurance." As we advised then, (a) there is nothing that "has been historically paid against the [occurrence wrap] reinsurance, (b) the December 15, 2005 request for payment was the first request for payment made for reinsurance under the occurrence wrap program, and (c) all payments made previously with respect to the CCC Insurance Program were made under the primary policies underwritten by NUFIC or under CCC's non-occurrence wrap reinsurance program.

At about the same time, we received an e-mail from Lance Williams "trying to confirm the Reinsurance Certificate numbers from the last two (2) payments AIG made to CCC. The amount of the invoices are $478,269.90 (2003) and $5,519,167.57 (2002)." On that same day we responded to Lance, explaining that the two payments to which he referred were not made in connection with NUFIC's participation in the occurrence wrap program, but were made in connection with NUFIC's participation in CCC's non-occurrence wrap reinsurance program in which NUFIC reinsured CCCIC in various layers and in various years from PY 1991/92 to PY 1995/96. We also provided NUFIC with all of the information requested with respect to its participation in the CCC Insurance Program as a direct insurer, as a reinsurer of CCCIC in the non-occurrence wrap program, and as a reinsurer in the occurrence wrap program.

In mid-August 2006 our broker advised us that he had just spoken with AIG's Bill Babicz, who had some questions. We responded to those questions in

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Jeffrey A. Gordon, Esq.
A.I. Healthcare
February 28, 2007
Page 3


an August 24, 2006 letter, which was accompanied by two computer disks updating the data and the sum then due. Through the broker, we followed up with NUFIC in September 2006, but our inquiries were met with silence.

Finally, in October 2006, we were pleased to receive a telephone call from you, advising that you are the person who is now handling the matter. You asked for additional information, including all of the underlying policies in the implicated years, loss runs and other data. In mid-November we provided that information to you, with the loss runs and other spreadsheets contained on a computer disk. You advised that, after reviewing the information, you would provide us with a sampling of claim files that NUFIC would like to audit.

Given this tortured history, I am sure you appreciate the level of frustration on CCC's part at the fact that the invoice continues to remain unpaid. And, I am sure you also appreciate that that frustration level only rose higher when we learned from your last e-mail that the sampling of files that NUFIC seeks to audit consists of 120 claim files, all but 2 of which are closed.

ARCA, CCC's claims administrator, advises that most of the 118 closed files have been closed for many years and that all of the closed files have been archived. This fact, combined with the sheer number of files requested, will significantly affect the speed at which the review can take place.

Given the circumstances, CCC is entitled to interest on the entire sums due. And, at this time, CCC is entitled to payment of at least the sum initially invoiced in December 2005, plus interest.

I look forward to hearing from you at your earliest possible convenience.


Sincerely,

Barry G. Saretsky

# SARETSKY KATZ DRANOFF & GLASS, L.L.P.

### 475 PARK AVENUE SOUTH
### NEW YORK, NEW YORK 10016

ROCKLAND COUNTY OFFICE

**BARRY G. SARETSKY**
bsaretsky@skdglaw.com

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

## WITHOUT PREJUDICE

November 1, 2007

Jeffrey A. Gordon, Esq.
Director, Complex Healthcare Malpractice Claims
A.I. Healthcare
101 Hudson Street, 28th Floor
Jersey City, New Jersey 07302

       Re:    National Union Fire Insurance Company of Pittsburgh, PA
               Reinsurance of CCC Insurance Corp. pursuant to
               Certificate of Casualty Reinsurance No. 3649635

Dear Jeff:

     I am writing in response to your request in the telephone message you left for me in connection with the $5 million still due to CCC Insurance Corp. ("CCCIC") under the above-referenced reinsurance certificate attributable to the Muniz claim.  That claim concerns a medical incident that took place on November 15, 1990, which is during the CCCIC policy period that runs from July 1, 1990 – July 1, 1991.

     By the terms of the NUFIC reinsurance certificate, NUFIC provides CCCIC with reinsurance for the Muniz "claim" if that "claim" was "discovered" during the period 7 to 10 years after the end of the policy period – that is, if the "claim" was "discovered" during the period July 1, 1998 to July 1, 2001.

     The Muniz action was filed on January 28, 2000 and was first reported to the CCC Program on February 10, 2000 when the hospital, New York Methodist Hospital, received a summons asserting a claim for damages.  Upon receipt of the first report, ARCA opened a claim file.  Because the claim for damages was reported to the CCC Program during the period July 1, 1998 to July 1, 2001, the Muniz "claim" was "discovered" during that period.  Therefore, the Muniz claim falls within the period implicated by the NUFIC reinsurance certificate.

     As we understand it, NUFIC's refusal to pay the $5 million due as respects the Muniz claim is premised upon NUFIC's view that the "claim" was not

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Jeffrey A. Gordon, Esq.
A.I. Health Care
November 1, 2007
Page 2

"discovered" during the period July 1, 1998 to July 1, 2001. NUFIC's position is based upon a reference in a defense counsel report dated July 7, 2000 stating that "there was a 'chart request' from plaintiff, Nancy Muniz, dated September 25, 1995 ...." Apparently, it is NUFIC's view that the chart request constitutes a "claim," and, because the chart request was made before July 1, 1998, NUFIC's position is that the Muniz claim is not one as to which NUFIC owes reinsurance under the certificate.

NUFIC's position is legally incorrect. It fails to recognize that, regardless of whether the insurance contract itself defines "claim," courts in this state and in others are unanimous in holding that a "claim" is an assertion of a legally cognizable right by a third person for injuries or damages caused by the insured, or a demand that can be defended, settled, and paid by the insurer. See, e.g., Evanston Ins. Co. v. GAB Business Services, Inc., 132 A.D.2d 180, 185 (1st Dep't 1987); Evanston Ins. Co. v. Security Assurance Co., 715 F. Supp. 1405, 1412 (N.D. Ill., Eastern Div., 1989); Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864, 866-67 (9th Cir. 1979); Safeco Title Ins. Co. v. Gannon, 774 P.2d 30, 33 (Wash. Ct. of Apps. Div. 1, 1989); In re Ambassador Group, 830 F.Supp. 147, 155 (E.D.N.Y. 1993). That "claim" has the same meaning here is implicit by the NUFIC reinsurance certificate itself, by which CCCIC, as the reinsured, is expected to promptly "settle and defend all claims under the policy reinsured hereunder ...." A request for medical records cannot be settled or defended and, as such, it is not a "claim."

At issue in Evanston v. GAB was whether a letter from the Southern California Rapid Transit District (RTD) to GAB, RTD's investigator and claims adjuster, constituted a "claim" under a policy insuring GAB for errors and omissions. RTD's letter demanded that GAB take specific steps to correct a broad spectrum of performance deficiencies and warned that, if GAB failed to take the corrective action, RTD would consider exercising its option to cancel the contract. On its face, RTD's letter left little doubt that RTD was displeased with GAB's performance and might even seek redress against GAB in the future. Even so, the Court held that RTD's letter did not constitute a "claim" against GAB because it did not assert that GAB had caused RTD financial or other damages and, as such, it was not an assertion by RTD of a legally cognizable right for injuries or damages caused by GAB.

The letter and telephone call at issue in Evanston Ins. Co. v. Security Assurance Co., warned Security, the insured, that it would be held liable to a

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Jeffrey A. Gordon, Esq.
A.I. Health Care
November 1, 2007
Page 4

that we note above, and holding that, although the letters indicated the likelihood, if not the inevitability, of some future claim, they were not "demand[s] for money or property or some specific relief accompanied by an allegation of negligence, malpractice, or some kind of wrongdoing." As such, said the Court, the letters did not constitute a "claim."

A patient's 'chart request' does not even begin to rise to the level of the communications at issue in the above-cited cases. Such a request is not a warning, threat or a challenge, let alone the assertion of a right to damages for injuries allegedly caused by the hospital.

Indeed, the reality is that hospitals receive and respond to 'chart requests' virtually every day in connection with a patient's follow-up care and treatment, or to ensure the completeness of the medical records maintained by the patient's primary care, or other, physician(s).

As a matter of law, therefore, and as a practical matter, a patient's request for medical records is neither a "claim" nor the "discovery" of a "claim."

As you know from our previous correspondence and our telephone discussions, we have been instructed to take whatever legal steps may be necessary to collect the sum due from NUFIC, but we would prefer to resolve the matter amicably, without legal proceedings. We trust that, with this explanation, you will be in a position to advise us that payment has been approved. We ask that you provide us with your response within the next 10 days.

Sincerely,

Barry G. Saretsky